Reed W. Super (Cal. Bar No. 164706)
SUPER LAW GROUP, LLC
411 State Street, Suite 2R
Brooklyn, New York 11217
Telephone: 212-242-2273
Facsimile: 855-242-7956
Email: reed@superlawgroup.com

Nicholas Jimenez (Cal. Bar No. 298172)
SIERRA CLUB, INC.
85 Second Street, Second Floor
San Francisco, CA 94105
Telephone: 415-977-5714
Facsimile: 415-977-5793
Email: nicholas.jimenez@sierraclub.org

Attorneys for Plaintiff
SIERRA CLUB, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, INC.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NATIONAL MARINE FISHERIES SERVICE,<br><br>　　　　　Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Freedom of Information Act, 5 U.S.C. § 552 *et seq.*) |

SIERRA CLUB, INC. (hereinafter "Sierra Club"), by and through its undersigned counsel, hereby alleges:

## I.    NATURE OF THE CASE

1.     Plaintiff asserts violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, by Defendant National Marine Fisheries Service ("NMFS"), a federal agency situated within the United States Department of Commerce.  NMFS has failed to produce records that Sierra Club requested under FOIA on August 11, 2014.

2.     Sierra Club's FOIA request concerns a formal consultation (hereinafter, the "ESA Consultation") undertaken by NMFS under the Endangered Species Act ("ESA") with respect to regulations promulgated by the U.S. Environmental Protection Agency ("EPA") under Section 316(b)

of the Clean Water Act (hereinafter, the "316(b) Rule").  Section 316(b) requires regulatory standards to minimize the adverse environmental impacts on fish and wildlife caused by cooling water intake structures at existing power plants and other industrial facilities.

3.     Industrial cooling water systems are, by far, the largest source of water withdrawals in the United States, drawing trillions of gallons per year from America's rivers, lakes, and oceans.  The enormous volume and force of these water withdrawals kills and injures billions of fish and other aquatic organisms each year, including many federally-listed threatened and endangered species, and damages the broader ecosystem.

4.     More than 16 months after receiving the FOIA request, and long past FOIA's statutory deadline, NMFS has still not completed its production of responsive documents.  NMFS has repeatedly unilaterally extended its estimated date of completion.  Further, NMFS's interim productions have withheld records that Sierra Club contends it is entitled to under FOIA.

5.     As a result of NMFS's failures, Sierra Club is being deprived of critical information regarding the government's development of the 316(b) Rule and the measures for protecting threatened and endangered species from intake structures.

## II.      JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

6.     This Court has jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. § 552(a)(4)(B).

7.     Venue is proper in this District because Plaintiff's principal places of business are located in this District.  5 U.S.C. § 552(a)(4)(B).

8.     Pursuant to Civil Local Rule 3-2(c), assignment to the San Francisco Division is appropriate because Plaintiff Sierra Club is incorporated in California and resides and maintains its headquarters in San Francisco County.

## III.     PARTIES

9.     Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grass-roots environmental organization.  The Sierra Club is a national nonprofit organization that is incorporated in California and has its headquarters in San Francisco, California.  It has more than one million members

and supporters, including thousands of members in California.  The Sierra Club is dedicated to the protection and preservation of the natural and human environment, including protecting threatened and endangered species and their habitat.  The Sierra Club's purpose is to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystem and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

10.     Defendant National Marine Fisheries Service, also known as "NOAA Fisheries" is a federal agency within the National Oceanic and Atmospheric Administration within the United States Department of Commerce, which is subject to the requirements of FOIA and has possession or control of records that Plaintiff seeks in this action.

## IV.     STATUTORY AND REGULATORY BACKGROUND

11.     "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NRLB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  In other words, as the Supreme Court has declared, "FOIA is often explained as a means for citizens to know what the Government is up to."  *Nat'l Archive & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (internal quotations and citations omitted).

12.     In particular, FOIA requires agencies of the federal government to release, upon request, information to the public, unless one of nine specific statutory exemptions applies.  5 U.S.C. § 552(a)(3)(A).  These exemptions are narrowly construed, and the agency bears the burden of establishing the applicability of each exemption as to each document for which it is claimed.

13.     Upon receiving a FOIA request, an agency has twenty working days to respond by determining whether responsive documents exist and whether the agency will release them.  5 U.S.C. § 552(a)(6)(A).

14.     FOIA allows an agency to delay an initial response for ten working days – but only ten working days – past the statutory deadline, if the agency can demonstrate that it faces "unusual circumstances" in responding to the request.  5 U.S.C. § 552(a)(6)(B).  "Unusual circumstances" include the need to search for and collect requested documents from other offices, the need to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    3

1    appropriately examine a voluminous amount of separate and distinct records, and the need to consult

2    with another agency.  5 U.S.C. § 552(a)(6)(B)(iii)(I-III).  Even under "unusual circumstances,"

3    however, an agency must provide notice of the delay and also provide "the date on which a

4    determination is expected to be dispatched."  5 U.S.C. § 552(a)(6)(B)(i).

5        15.    The agency must provide information about the status of the request including "an

6    estimated date on which the agency will complete action on the request."  5 U.S.C. § 552(a)(7)(B)(ii).

7    This date and other information about the status of the request must be available through a telephonic

8    line or internet service established by the agency.  *Id.*

9        16.    When an agency denies, in whole or in part, a request for records under FOIA, the

10   agency must make a "reasonable effort to estimate the volume of any requested matter the provision of

11   which is denied, and shall provide any such estimate to the person making the request."  5 U.S.C. §

12   552(a)(6)(F).

13       17.    FOIA expressly provides that a requester "shall be deemed to have exhausted his

14   administrative remedies . . . if the agency fails to comply with the applicable time limit provisions"

15   governing its response to a FOIA request or an appeal.  5 U.S.C. § 552(a)(6)(C).

16   **V.    STATEMENT OF FACTS**

17       **A.    Cooling Water Intake Structures Kill Billions of Fish Every Year.**

18       18.    Power plants and other industrial facilities use cooling water intake structures to

19   withdraw massive volumes of water for cooling.  Collectively, the nation's industrial cooling systems

20   withdraw more water than is used for municipal water supplies and irrigated agriculture combined.

21       19.    The largest plants in the country can draw enough water from a river to fill an Olympic

22   swimming pool in less than 30 seconds.  It is no wonder, then, that every year, hundreds of billions of

23   juvenile fish, larvae, eggs and other aquatic organisms – including the young of many threatened and

24   endangered species – are trapped and killed by the incredibly powerful pumps at such facilities.

25       20.    The withdrawal of cooling from natural water bodies causes multiple types of

26

27

28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF            4

undesirable adverse environmental impacts, including but not limited to entrainment[1] and impingement;[2] reductions of threatened, endangered or other protected species; damage to critical aquatic organisms, including important elements of the food chain; diminishment of fish population's compensatory reserve; losses to populations including reductions of indigenous species populations and commercial and recreational fishery stocks; and stresses to overall communities and ecosystems.

21.     By EPA's highly conservative estimates, industrial cooling water withdrawals annually result in the death of at least 2.2 billion age one-equivalent fish, crabs, and shrimp, and a minimum of 528 billion eggs and larvae that serve as the basis of the aquatic food chain.  In many cases, the toll on fisheries by power plants rivals or exceeds that of the fishing industry.  These withdrawals also destroy individuals from at least 266 federally-listed threatened and endangered species, and adversely impact the designated critical habitat of certain protected species.

22.     "The environmental impact of these systems is staggering: A single power plant might impinge a million adult fish in just a three-week period, or entrain some 3 to 4 billion smaller fish and shellfish in a year, destabilizing wildlife populations in the surrounding ecosystem." *Riverkeeper, Inc. v. U.S. EPA*, 358 F.3d 174, 181 (2d Cir. 2004).

### B.     EPA's Regulations and the Endangered Species Act Consultation.

23.     In the Clean Water Act of 1972, Congress ordered EPA to minimize the devastating environmental impacts that cooling water intake structures have on America's waters by setting nationally uniform and binding regulations.  *See* CWA Section 316(b); 33 U.S.C. § 1326(b).

24.     In 2001, 2004 and 2006 EPA promulgated Section 316(b) regulations that were challenged and upheld in part and remanded in part.  *See Riverkeeper, Inc. v. U.S. EPA*, 358 F.3d 174 (2d Cir. 2004) ("*Riverkeeper I*"); *Riverkeeper, Inc. v. U.S. EPA*, 475 F.3d 83 (2d Cir. 2007) ("*Riverkeeper II*"); *ConocoPhillips Co. v. EPA,* 612 F.3d 822 (5th Cir. 2010).

---

[1] *Entrainment* refers to the extracting of fish eggs and larvae and other small organisms from a source waterbody into and through a power plant's cooling system, where they are killed or injured by thermal, physical and chemical shocks.

[2] *Impingement* refers to the trapping of adult and juvenile fish and other large aquatic organisms, including sea turtles and marine mammals, on the screens of an intake structure, which can kill or injure those animals through asphyxiation, descaling and other harms.

25.     In 2007, EPA suspended the regulations that were remanded in large part by the Second Circuit in *Riverkeeper II*. 72 Fed. Reg. 37,107, 37,108 (July 9, 2007).

26.     On remand from the circuit courts, in 2011, EPA proposed new Section 316(b) regulations for existing facilities and revised its regulations for new facilities.

27.     On June 18, 2013, EPA initiated the formal ESA Consultation with NMFS and the U.S. Fish and Wildlife Service following comments by environmental groups, including Sierra Club, that EPA must undertake such consultation.

28.     The ESA Consultation concluded approximately eleven months later, on May 19, 2014, with the Services' release of a programmatic biological opinion on EPA's issuance and implementation of the 316(b) Rule ("Biological Opinion").

29.     On May 19, 2014, the EPA Administrator signed the final 316(b) Rule, entitled *National Pollutant Discharge Elimination System—Final Regulations to Establish Requirements for Cooling Water Intake Structures at Existing Facilities and Amend Requirements at Phase I Facilities* (EPA-HQ-OW-2008-0667).

30.     EPA published the 316(b) Rule in the Federal Register on August 15, 2014.

**C.     The FOIA Request.**

31.     On August 11, 2014, Sierra Club submitted a FOIA request to NMFS asking that it make available for inspection and copying eight categories of records relating to the 316(b) Rule, Biological Opinion and ESA Consultation.  *See* Exhibit A.

**D.     NMFS's Response.**

32.     NMFS's response to Sierra Club's request has been wholly inadequate.

33.     On August 13, 2014, NMFS mailed an initial response acknowledging receipt of Sierra Club's August 11, 2014, request and assigned that request a tracking number, FOIA# DOC-NOAA-2014-001474. *See* Exhibit B.

34.     On August 27, 2014, counsel for the parties conferred regarding the scope of the request.

35.     On September 8, 2014, Sierra Club agreed to narrow the scope of the request to exclude records containing routine administrative matters and personally identifiable information. *See* Exhibit

C.

36.     On September 25, 2014, Sierra Club received an email from NMFS estimating that the "earliest [NMFS] can provide a response is November 21[, 2014]." *See* Exhibit D.

37.     Having received no records from NMFS, on December 3, 2014, Sierra Club requested a status update from NMFS.

38.     On December 11, 2014, NMFS responded that it was not able to provide an estimated date of completion, but "anticipate[d] being able to provide a date certain for providing our response" by the end of January 2015.  *See* Exhibit E.

39.     After January 2015 passed with no information from NMFS, on February 24, 2015, Sierra Club requested a status update from NMFS, followed by another request for a status update on March 4, 2015.

40.     On March 3, 2015, more than six months after Sierra Club submitted its FOIA request, NMFS released the first production of responsive records, which was composed of only five documents totaling 51 pages.

41.     On March 4, 2015, after a telephone conversation between the parties, counsel for NMFS sent Sierra Club an email stating that "review of the documents responsive to the FOIA request will occur in conjunction with the preparation of the administrative record in the pending litigation . . . . We anticipate being able to provide a final response approximately one month after the filing of the administrative record [in *Cooling Water Intake Structure v. U.S. Environmental Protection Agency,* U.S. Court of Appeals for the Second Circuit, No. 14-4645 and consolidated cases]." *See* Exhibit F. Sierra Club and NMFS are parties to the referenced *Cooling Water Intake Structure v. EPA* case in the Second Circuit.  The administrative record in that case was due on July 13, 2015 (and, indeed, was filed on that date).  Thus, the anticipated date of completion in NMFS's March 4, 2015, email was August 13, 2015.

42.     In July 2015, NMFS informed Sierra Club that it would not complete its response to the FOIA request by August 13, 2015, and that the new estimated completion date for the FOIA request would be October 30, 2015.

43.     On or about August 3, 2015, Sierra Club received a second partial production from

NMFS consisting of 353 documents.  *See* Exhibit G.

44.     On or about September 10, 2015, Sierra Club received a third partial production from NMFS consisting of 73 documents.  *See* Exhibit H.

45.     On September 29, 2015, NMFS notified Sierra Club that it would be unable to complete its response to the FOIA request by October 30, 2015, and anticipated providing a final release of documents by January 31, 2016.  *See* Exhibit I.

46.     On November 2, 2015, Sierra Club received a fourth partial production consisting of 268 emails and attachments.  In its November 2nd response, NMFS redacted 75 documents and withheld 688 documents.  *See* Exhibit J.

47.     On or about November 13, 2015, Sierra Club submitted an administrative appeal to NMFS concerning NMFS's excessive and undue delay in complying with FOIA as well as NMFS's misuse of the deliberative process privilege to withhold responsive records.  *See* Exhibit K.

48.     The statutory deadline for responding to Sierra Club's appeal was December 14, 2015, *See* 5 U.S.C. § 552(a)(6)(A)(ii) (agencies must respond to appeals within 20 business days).  NMFS did not timely respond to the appeal.

49.     On or about December 11, 2015, Sierra Club received a fifth partial production consisting of 268 emails and attachments.  In its December 11th response, NMFS partially redacted 269 documents, fully redacted 212 documents, and withheld 392 documents.  *See* Exhibit L.

50.     More than sixteen months has now passed since NMFS received Sierra Club's FOIA request, NMFS has repeatedly extended the date by which it would complete production of documents responsive to the request, has not completed its production, and has unlawfully redacted and withheld responsive documents.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Failure to properly and timely respond to FOIA request**

**(Violation of FOIA, 5 U.S.C. §§ 552)**

51.     Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint as if fully set forth herein.

52.     By failing to properly and timely respond to Sierra Club's August 11, 2014, FOIA request and provide all records responsive thereto, NMFS has violated FOIA's mandate to release agency records to the public.  *See* 5 U.S.C. §§ 552(a)(3)(A) and (a)(6).

53.     NMFS has wrongfully withheld the requested records from Sierra Club.

54.     Sierra Club has exhausted any and all applicable administrative remedies.

55.     Sierra Club is entitled to obtain the requested records immediately.

### SECOND CAUSE OF ACTION

**Improperly withholding responsive records**

**(Violation of FOIA, 5 U.S.C. §§ 552)**

56.     Plaintiff realleges and incorporates the allegations of all the preceding paragraphs of this Complaint as if fully set forth herein.

57.     NMFS has withheld documents, purportedly on the basis of a FOIA exemption, without meeting its burden of establishing that the exemption applies.

58.     NMFS has improperly withheld and redacted documents responsive to Sierra Club's FOIA request that are not within the scope of the exemption asserted by NMFS.

59.     NMFS has wrongfully withheld requested records from Plaintiff.

60.     Plaintiff has exhausted any and all applicable administrative remedies.

61.     Sierra Club is entitled to obtain the requested records immediately.

**VII.    RELIEF REQUESTED**

**WHEREFORE**, Plaintiff requests that this Court enter an order and judgment:

a.    Declaring that Defendant NMFS has violated FOIA by failing to properly respond to Plaintiff's FOIA request and provide all responsive records;

b.    Declaring that Defendant NMFS has failed to comply with FOIA's statutory deadlines.

c.    Ordering that Defendant NMFS immediately produce all requested records to Plaintiff along with a "*Vaughn* index" of any records withheld under claim of exemption;

d.    Ordering that Defendant NMFS produce any documents listed on its *Vaughn* index that the Court determines are not exempt from FOIA;

e.   Awarding Plaintiff its litigation costs and reasonable attorneys' fees in this action; and

f.   Ordering such other and further relief as the Court may deem just and proper.

Dated:  December 21, 2015          Respectfully submitted,
                                   SUPER LAW GROUP, LLC.

                                   By: s/ Reed W. Super
                                       Reed W. Super
                                       Attorney for Plaintiff
                                       Sierra Club