**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB, INC., *Plaintiff-Appellee*, | No. 17-16560 |
| v. | D.C. No. 3:15-cv-05872-EDL |
| UNITED STATES FISH AND WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE, *Defendants-Appellants.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
Elizabeth D. Laporte, Magistrate Judge, Presiding

Argued and Submitted March 15, 2018
San Francisco, California

Filed December 21, 2018

Before:  J. Clifford Wallace and Marsha S. Berzon, Circuit
Judges, and Terrence Berg,[*] District Judge.

Opinion by Judge Berg;
Partial Concurrence and Partial Dissent by Judge Wallace

---

[*] The Honorable Terrence Berg, United States District Judge for the
Eastern District of Michigan, sitting by designation.

2     SIERRA CLUB v. USFWS

---

## SUMMARY[**]

---

### Freedom of Information Act

The panel affirmed in part and reversed in part the district court's decision that ordered the U.S. Department of Fish and Wildlife Services and the National Marine Fisheries Service to turn over 12 of 16 requested records in a Freedom of Information Act ("FOIA") action brought by the Sierra Club challenging the Services' denial of their request for records generated during the Environmental Protection Agency's rule-making process concerning cooling water intake structures.

Exemption 5 of FOIA shields documents subject to the "deliberative process privilege" from disclosure.

The panel held the December 2013 draft jeopardy biological opinions, the accompanying statistical table, the accompanying instructional documents, and the March 2014 reasonable and prudent alternative (RPA) were not both pre-decisional and deliberative. The panel therefore affirmed in part the district court's summary judgment order requiring the production of these records.

The panel held that there was sufficient support to conclude that the December 2013 RPAs and the April 2014 draft jeopardy opinion were pre-decisional and deliberative. Because these records satisfied the standard for non-

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

disclosure under FOIA Exemption 5, the panel reversed the district court's order for their production.

The panel instructed the district court on remand to perform a segregability analysis.

Judge Wallace concurred in the result reached by the majority as to the April 2014 draft opinion and the December 2013 RPAs, and dissented from the result reached by the majority as to the rest of the documents because he disagreed with the majority that the deliberative process privilege did not protect the December draft opinions and other documents.

## COUNSEL

Thomas Pulham (argued), Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Washington, D.C., for Defendants-Appellants.

Reed W. Super (argued) and Michael DiGuglio, Super Law Group LLC, New York, New York, for Plaintiff-Appellee.

Shaun A. Goho, Emmett Environmental Law & Policy Clinic, Harvard Law School, Cambridge, Massachusetts, for Amicus Curiae Union of Concerned Scientists.

SIERRA CLUB v. USFWS

## OPINION

BERG, District Judge:

Across the United States, thousands of large industrial facilities, power plants, and other manufacturing and processing complexes draw billions of gallons of water each day from lakes, rivers, estuaries and oceans in order to cool their facilities through cooling water intake structures.[1] These structures can harm fish, shellfish, and their eggs by pulling them into the factory's cooling system; they can injure or kill other aquatic life by generating heat or releasing chemicals during cleaning processes; and they can injure larger fish, reptiles and mammals by trapping them against the intake screens.[2] Section 316(b) of the Clean Water Act, 33 U.S.C. § 1326(b), directs the Environmental Protection Agency (EPA) to regulate the design and operation of cooling water intake structures to minimize these adverse effects.

In April 2011, the EPA proposed new regulations under Section 316(b) for cooling water intake structures. 76 Fed. Reg. 22,174 (April 20, 2011). The final rule was published in the Federal Register in August 2014. Final Regulations to Establish Requirements for Cooling Water Intake Structures, 79 Fed. Reg. 48,300 (Aug. 15, 2014) (to be codified at 40 C.F.R. pts. 122 & 125). As part of the rule-making process, EPA consulted with Appellants, the United States Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively, the Services), about

---

[1] *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 181 (2d Cir. 2004).

[2] See *Cooling Water Intakes*, Envtl. Protection Agency, https://www.epa.gov/cooling-water-intakes.

the impact the regulation might have under the Endangered Species Act (ESA). Section 7 of the ESA and implementing regulations require federal agencies to consult with the Services whenever an agency engages in an action that "may affect" a "listed species" (i.e., one that is protected under the ESA). 50 C.F.R. § 402.14(a). The purpose of the consultation is to ensure that the agency action is "not likely to jeopardize the continued existence" or "result in the destruction or adverse modification of habitat" of any endangered or threatened species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). As part of this Section 7 consultation process, the Services must prepare a written biological opinion on whether the proposed agency action is one that poses "jeopardy" or "no jeopardy" to the continued existence of a listed species or critical habitat. 50 C.F.R. § 402.14(h)(3). If the opinion concludes that the agency action causes "jeopardy," the Services must propose "reasonable and prudent alternatives" (RPAs) to the action that would avoid jeopardizing the threatened species. 16 U.S.C § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(8), (h)(3).[3]

Appellee, the Sierra Club, made a Freedom of Information Act ("FOIA") request to the Services for records generated during the EPA's rule-making process concerning cooling water intake structures, including documents generated by the Services as part of an ESA Section 7 consultation about the rule. The Services withheld a number of the sought-after records under "Exemption 5" of FOIA,

---

[3] The Second Circuit in a consolidated case recently denied a petition to review several challenges to this final rule under the Clean Water Act, the Administrative Procedures Act, and the Endangered Species Act. *Cooling Water Intake Structure Coal. v. EPA*, 898 F.3d 173 (2d Cir. 2018), *amended*, 2018 WL 4678440 (2d Cir. Sept. 27, 2018).

which shields documents subject to the "deliberative process privilege" from disclosure. *See* 5 U.S.C. § 552(b)(5); *see also Kowack v. U.S. Forest Serv.*, 766 F.3d 1130, 1135 (9th Cir. 2014). The district court determined that 12 of the 16 requested records were not protected by the privilege, in whole or in part, and ordered the Services to turn them over to the Sierra Club. The Services now appeal. We affirm in part and reverse in part.

## I.  BACKGROUND

### a.  Factual History

In 2012, the EPA began an informal consultation process with the Services about a proposed rule for regulating the requirements governing the operation of cooling water intake structures. The EPA requested a formal consultation on the proposed rule in 2013. On November 4, 2013, the Services received a revised version of the proposed rule from the Office of Management and Budget (OMB). On November 15, 2013, the Services sent a "Description of the Action" (i.e. a summary of what the Services thought the proposed rule set out to do) to the EPA. Finally, on November 26, 2013, the EPA responded with corrections to the Services' description of the rule and the Services incorporated the EPA's corrections. The EPA and the Services tentatively agreed that the FWS and NMFS would each provide a draft biological opinion to the EPA by December 6, 2013, and a final opinion by December 20, 2013.

After reviewing the November 2013 proposed rule, both Services prepared draft opinions finding that the rule in its then-current form was likely to cause jeopardy for ESA-protected species and negatively impact their designated critical habitats. The Services also proposed RPAs to

accompany those jeopardy opinions. At the same time, NMFS discussed whether the jeopardy opinions should be sent to "the Hill" or OMB, or posted to its docket, which was publicly available at regulations.gov.

NMFS completed its draft jeopardy opinion on December 6, 2013 and FWS completed its draft jeopardy opinion on December 9, 2013, both for transmission to the EPA. The ESA regulations require that the Services make draft opinions available to the Federal agency that initiated the formal consultation upon request. 50 C.F.R. § 402.14(g)(5). Here, the Services sent the EPA portions of its December 2013 draft jeopardy opinions, but never formally transmitted them in their entirety.

On December 12, 2013, the FWS Deputy Solicitor called and emailed the EPA General Counsel to "touch base . . . about transmitting a document to EPA." He also emailed "the current draft RPAs" to the EPA that same day. On December 17, 2013, the NMFS sent a "Revised Combined NMFS and USFWS RPA" to the EPA. The Services have further indicated in their briefing that they also provided other unspecified portions of the draft jeopardy opinions to the EPA.

After the transmission of these partial December 2013 jeopardy biological opinions and accompanying documents, the EPA issued a new version of the rule, the "final Rule and Preamble," which it sent to the Services on March 14, 2014. On April 7, 2014, NMFS employees completed and internally circulated a draft of another jeopardy biological opinion. During this same time frame, the Services and the EPA discussed whether the EPA agreed with the Services' interpretation and understanding of the March 2014 final rule: On March 31, 2014 the Services sent the EPA a document "seeking clarification on the Services'

understandings of key elements in EPA's proposed action." On April 8, 2014, EPA "provided confirmation on the Services' description and understanding of the key elements of EPA proposed action." Finally, on May 19, 2014, the Services issued a joint final "no jeopardy" biological opinion regarding the March 2014 final rule. The EPA issued the regulation that same day, and it was published in the Federal Register on August 15, 2014. Final Regulations to Establish Requirements for Cooling Water Intake Structures, 79 Fed. Reg. 48,300.

On August 11, 2014, the Sierra Club submitted FOIA requests to the Services for records related to this ESA Section 7 consultation. In response, the Services produced a large quantity of documents (some of which were partially redacted). The Services withheld other documents under FOIA Exemption 5, which protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

In summary, the key chronological dates in this FOIA dispute are:

- **June 18, 2013**: EPA initiates formal consultation under ESA Section 7 with the Services regarding the proposed rule.

- **November 4, 2013:** The Services receive the most recent version of the EPA's proposed rule from OMB.

- **November 15, 2013**: The Services send the Description of the Action (i.e. a summary of their understanding of the proposed rule) to the EPA for review.

- **November 26, 2013**: EPA sends the Services its corrections and comments on the Description of the Action, which the EPA incorporated into the final description of the November 2013 proposed rule.

- **December 3, 2013:** The Services inform the EPA that their draft opinions are "jeopardy opinions" and will be completed on or around December 6, 2013.

- **December 6, 2013:** NMFS completes its draft jeopardy opinion.

- **December 9, 2013:** FWS completes its draft jeopardy opinion.

- **December 12, 2013:** FWS Deputy Solicitor calls the EPA General Counsel to "touch base . . . about transmitting a document to EPA."

- **December 12 & 17, 2013:** The Services email two RPAs—written to accompany the draft jeopardy opinions—to the EPA.

- **March 14, 2014:** EPA sends the Services a new, final rule for review and Biological Opinion analysis.

- **March 31, 2014:** The Services send the EPA a document requesting clarification regarding their understanding of elements of the final rule.

- **April 7, 2014:** NMFS employees internally circulate a draft jeopardy biological opinion relating to the March 14, 2014 proposed rule; this draft is not sent to EPA.

- **April 8, 2014:** EPA confirms the Services' interpretations and understanding of the final rule contained in the Services' clarification document.

- **May 19, 2014**: The Services issue a joint final no jeopardy biological opinion regarding the March 14, 2014 proposed rule.

### b. Procedural History

On December 21, 2015, the Sierra Club filed suit against the Services, arguing that they had improperly withheld documents under FOIA Exemption 5. The parties filed cross-motions for summary judgment regarding their release. During and after that hearing the district court and the parties narrowed the list of contested documents to 16. The district court found that 4 of the disputed documents were fully protected under Exemption 5 but ordered that the Services produce one document in part and the other eleven in full.[4] The Services timely appealed the district court's

---

[4] Although the district court initially cited the correct test for FOIA Exemption 5—that exempt documents must be both "pre-decisional" and "deliberative" to avoid disclosure—the test it applied to each document was whether it was a "relatively polished draft" that contained "subjective comments, recommendations, or opinions." These factors, though they might bear on whether a document was "pre-decisional" or "deliberative," are not dispositive—and to the extent the district court's analysis depended solely on these factors, it was in error. Because the standard of review on appeal from an Exemption 5 challenge is *de novo*, however, we have examined each of the contested documents to determine whether they satisfy the "pre-decisional" and "deliberative" test.

order to produce the documents, and the parties stipulated to stay of production pending appeal.[5]

The documents at issue on appeal—those that the district court found were not exempt from disclosure—were submitted to the panel under seal for *in camera* review. They are:

### 1. Biological Opinions

   i. **"NMFS 44516.1":** A 289-page NMFS draft jeopardy biological opinion dated December 6, 2013;

   ii. **"FWS 252":** A 72-page FWS draft jeopardy biological opinion dated December 9, 2013;

   iii. **"NMFS 5427.1":** A 334-page NMFS draft jeopardy biological opinion dated April 7, 2014;[6]

### 2. Reasonable and Prudent Alternatives (RPAs)

   i. **"FWS 279":** A 4-page FWS RPA, dated December 17, 2013;

---

[5] Sierra Club did not cross-appeal to challenge the district court's holding that four of the requested documents were completely protected under Exemption 5.

[6] The draft opinion itself is undated. The district court opinion states that it was dated April 4, 2014, but the affidavit submitted on behalf of the agency that created it states it was sent via email on April 7, 2014. We therefore refer to it as the April 7, 2014 draft opinion.

ii. **"FWS 308":** A 3-page FWS RPA, dated December 18, 2013;

iii. **"FWS 555":** A 2-page FWS RPA, dated March 6, 2014.

**3. Other Documents**

i. **"NMFS 61721":** A 1-page statistical table showing estimated aggregate effects of cooling water intake structure facilities on protected species;

ii. **"NMFS 5597.1":** A 2-page document that describes steps that facility owners/operators must take if abalone, an endangered species, is affected by their cooling water intake structures;

iii. **"NMFS 7544.2":** A 15-page document on Anadromous Salmonid Requirements that provides criteria and guidelines to be utilized by owner/operators in the development of downstream migrant fish screen facilities for hydroelectric, irrigation, and other water withdrawal projects;

iv. **"NMFS 37695":** A 2-page document that lists the steps that owner/operators must follow if a seal, sea lion, or fur seal, or their designated critical habitat, may be affected by a cooling water intake structure;

v. **"NMFS 37667":** A 3-page document that lists the steps that owner/operators must

follow if sea turtles are affected by their cooling water intake structures;

vi. **"NMFS 14973":**  A 5-page document that lists the terms and conditions with which the EPA and an owner/operator must comply in order to be exempt from Section 9 of the ESA. These terms and conditions involve the protocols for dealing with sea turtles near cooling water intake structures. The district court held NMFS could redact one sentence but had to disclose the rest of the document.

## II.  STANDARD OF REVIEW

In FOIA cases, this court reviews summary judgment determinations *de novo*. *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 990 (9th Cir. 2016) (en banc).

## III.    DISCUSSION

Section 522 of Title 5, FOIA, "mandates a policy of broad disclosure of government documents." *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1082, 1085 (9th Cir. 1997) (*Maricopa I*) (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 741 (9th Cir. 1979) (internal quotations omitted)). Agencies may withhold documents only pursuant to the exemptions listed in § 552(b).  *See id*.

Here, the Services argue that the 12 documents the district court ordered them to produce to the Sierra Club are protected  under  § 552(b)(5)  (Exemption  5).  Under Exemption 5, FOIA's general requirement to make information available to the public does not apply to "inter-

agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5).

This exemption has been interpreted as coextensive with all civil discovery privileges. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). The particular privilege the Services have claimed here is the "deliberative process privilege," which permits agencies to withhold documents "to prevent injury to the quality of agency decisions by ensuring that the frank discussion of legal or policy matters in writing, within the agency, is not inhibited by public disclosure." *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997) (*Maricopa II*) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975) (internal quotations omitted)).

Because FOIA is meant to promote disclosure, its exemptions are interpreted narrowly. *Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 920 (9th Cir. 1992) (citing *Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988)). The dissent argues that because the FOIA Exemption 5 privileges "inter-agency or intra-agency memorandums or letters" and because the documents at issue here were transmitted between agencies, they should be exempt from disclosure. We agree that the documents must be considered in the context in which they were produced, *Sears, Roebuck & Co.*, 421 U.S. at 138. But a document's origins as part of the inter-agency consultation process between the EPA and the Services, *see* 50 C.F.R. § 402.14(a), only relate to a threshold requirement for applying Exemption 5—that the document is an "inter-agency or intra-agency memorandum." Beyond that threshold, "to qualify [under the deliberative process privilege] a document must thus satisfy two conditions: its source must be a Government

agency and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

This circuit has defined the ambit of the deliberative process privilege under Exemption 5 narrowly. It "applies only if disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Kowack*, 766 F.3d at 1135 (quoting *Maricopa II*, 108 F.3d at 1093) (internal quotations omitted) (finding the Forest Service had not sufficiently demonstrated that disclosure of redacted portions of an intra-agency investigative report regarding alleged employee misconduct contained more than factual, i.e., deliberative, content).

The Services therefore bear the burden of proving that the documents they maintain should be exempt from disclosure are both "pre-decisional and deliberative." *Carter v. Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002) (internal quotations omitted).[7]

---

[7] In *Cooling Water Intake Structure Coal. v. EPA*, 898 F.3d 173 (2d Cir. 2018), *amended*, 2018 WL 4678440 (2d. Cir. Sep. 27, 2018), the plaintiffs asked to supplement the certified record with what appear to be the same documents at issue in this case. 2018 WL 3520398 at *7 n.9. Finding "nothing in the privilege log that would disturb the 'presumption of regularity' afforded to the agencies' certified record," *id*. (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)), the Second Circuit denied this motion in a footnote, noting that the EPA had "produced a privilege log that adequately describes the nature of [the requested documents] and their rationale for classifying [them] as

These pre-decisional and deliberative prongs are analyzed separately although the issues they address overlap. *Assembly of Cal.*, 986 F.2d at 920. For the reasons explained below, we conclude that the December 2013 draft jeopardy biological opinions (NMFS 44516.1 and FWS 252), the accompanying statistical table (NMFS 61721), the accompanying instructional documents (NMFS 5597.1, NMFS 7544.2, NMFS 37695, NMFS 37667, NMFS 14973.1), and the March 2014 RPA (FWS 555) were not both pre-decisional and deliberative. We therefore AFFIRM in part the district court's summary judgment order requiring the production of these records. There is, however, sufficient support for concluding the December 2013 RPAs (FWS 279, 308) and the April 2014 draft jeopardy opinion (NMFS 5427.1) were pre-decisional and deliberative. Because these records satisfy the standard for non-disclosure under FOIA Exemption 5, we REVERSE the district court's order for their production.

---

deliberative and therefore privileged," and thus the Agency had satisfied their obligation under Fed. R. Civ. P. 26(b)(5)(A)(ii) (requiring that a party claiming privilege describe the privileged documents in a manner that allowed other parties to assess the claim). *Cooling Water Intake Structure Coal.*, 2018 WL 4678440 at *7 n.9. *Cooling Water Intake* did not, however, analyze whether the reasons given in the privilege log for the claims of privilege were justified. Instead, the Second Circuit applied a "presumption of regularity" regarding the administrative record, not applicable here. It did not address whether the EPA had carried a burden of showing that the documents at issue were both deliberative and pre-decisional, as we must do to determine whether they should be disclosed under FOIA, *Carter*, 307 F.3d at 1089. Given the different burdens, we do not believe that the footnote in that decision suggests a different result than the one we reach.

### a. Pre-decisional

A document is pre-decisional if it is "prepared in order to assist an agency decision-maker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Assembly of Cal.*, 968 F.2d at 920 (citation and internal quotations omitted). The agency requesting the exemption "must identify a specific decision to which the document is pre-decisional." *Maricopa II*, 108 F.3d at 1094.

Here, the Services argue that the December 2013 and April 2014 jeopardy opinions, the three RPAs, and all of the other statistical and instructional documents pre-date the May 2014 "no jeopardy" opinion and are thus pre-decisional as to that final opinion.

### 1. April 2014 NMFS Draft Biological Opinion

We agree that the April 2014 draft jeopardy opinion (NMFS 542.71) was prepared as an internal agency document. It was only circulated between groups of NMFS employees, and there is nothing in the record that indicates that the jeopardy finding was communicated even informally to the EPA. Where one document reflects an earlier position of the agency—as the April 2014 draft jeopardy opinion does here when compared with the May 2014 final no jeopardy opinion—it is pre-decisional as to the issues addressed in both. *See Nat. Wildlife Fed.*, 861 F.2d at 1120 (documents that were "working drafts" subject to revision are pre-decisional). In other words, it does not appear to represent the conclusion of the agency on the likely impact of the final March 2014 rule, but rather is an interim step,

communicated only internally within NMFS. The document expressed the agency staff's initial opinion as to the rule. NMFS never adopted that opinion as the agency's; instead, the NMFS ultimately joined the FWS in a final joint no jeopardy opinion in May 2014 regarding the final March 2014 rule.[8]

## 2. RPAs

We also agree that the December 2013 RPAs (FWS 279, 308) are pre-decisional because they appear to be earlier drafts of the third, March 2014 RPA (FWS 555). In other words, the December 2013 RPAs do not reflect the FWS' final position regarding the kinds of changes the November 2013 version of the rule needed in order to comply with the ESA. The December 2013 RPAs, but not the March 2014 RPA, are therefore pre-decisional.

## 3. 2013 Draft Biological Opinions

We disagree with the Services, however, that the December 2013 draft jeopardy opinions (NMFS 44516.1; FWS 252) are pre-decisional. These two jeopardy opinions

---

[8] We recognize the difference between the NMFS April 2014 "jeopardy opinion" and the NMFS and FWS joint May 2014 "no-jeopardy" opinion, both of which address the March 2014 proposed EPA rule. The cover letter transmitting the final "no jeopardy" opinion of May 19, 2014 explains that its opinion is based in part on "the Services' interpretations of that rule as agreed upon by EPA on April 8, 2014." These interpretations—obviously considered of key importance to the Services—were agreed to by EPA during the same time frame that NMFS was preparing its earlier jeopardy opinion, which it ultimately decided not to send. Beyond this, we do not know why NMFS decided to join the final "no jeopardy" opinion after its staff earlier proposed reaching the opposite conclusion. But "back-and-forth" debate is precisely the type of deliberative process that Exemption 5 protects.

represent the final view of the Services regarding the then-current November 2013 proposed rule; the May 2014 no jeopardy opinion represents the final view of Services regarding the later March 2014 revised, proposed rule.

Both the Supreme Court and this court have held that the issuance of a biological opinion is a final agency action. *Bennet v. Spear*, 520 U.S. 154, 178 (1997); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006). So our focus is on whether each document at issue is pre-decisional as to a biological opinion, not whether it is pre-decisional as to the EPA's rulemaking. Although the December 2013 biological opinions in this case were not *publicly* issued, they nonetheless represent the Services' final views and recommendations regarding the EPA's then-proposed regulation. The purpose of the December 2013 jeopardy biological opinions and their accompanying documents was not to advise another decision-maker higher up the chain about what the Service's position should be on the proposed rule. Instead, these opinions, created pursuant to an ESA Section 7 formal consultation, contain the final conclusions by the final decision-makers—the consulting Services—regarding whether a proposed regulation will harm protected species and habitat. *See* 50 C.F.R. 402.14(h)(3) (a biological opinion is "[t]he *Service's* opinion on whether the action is likely to jeopardize the continued existence of listed species. . . .") (emphasis added).

Where, as here, a document is created by a final decision-maker and represents the final view of an entire agency as to a matter which, once concluded, is a final agency action independent of another agency's use of that document, it is not pre-decisional. *Cf. Maricopa II*, 108 F.3d at 1094 (Forest Service's internal investigative report was prepared to advise

the Chief of the Forest Service on how the agency should
respond to misconduct allegations and was thus pre-
decisional); *Kowack v. U.S. Forest Serv.*, 766 F.3d 1130,
1135 (9th Cir. 2014) (investigative reports prepared by the
Forest Service's Misconduct Investigations program
manager were meant to assist the agency in making a final
decision regarding how to deal with an employee and were
thus pre-decisional).

The record reflects the finality of the conclusions in the
December 2013 draft jeopardy opinions. The documents had
been approved by final decision-makers at each agency: the
email correspondence in the record indicates Gary Frazer,
the Assistant Director for Ecological Services at FWS who
was responsible for overseeing and administering ESA
consultations, made final edits to the FWS Service
December 9, 2013 jeopardy opinion and that the document
was awaiting his autopen signature. NMFS meanwhile was
preparing "talking points" for its legislative affairs staff and
preparing to release the drafts to the public.

Moreover, the Services' own account indicates that the
EPA made changes to its proposed regulations *after*
December 2013—that is, after both Services' jeopardy
opinions were completed and partially transmitted to the
EPA—and that the "final" May 2014 Biological Opinion
reflected the Services' opinion concerning the EPA's later
*revised* proposed regulation.

The fact that the December 2013 jeopardy opinions pre-
dated the later no jeopardy opinion does not render them pre-
decisional. "[M]aterial which predate[s] a decision
chronologically, but did not contribute to that decision is not
predecisional in any meaningful sense." *Assembly of Cal.*,
968 F.2d at 921 (census data prepared by the Department of
Commerce "solely for the purpose of post-decision

dissemination" if the Secretary decided to adjust the census was not pre-decisional merely because it predated the Secretary's decision). The December 2013 jeopardy opinions pre-date the May 2014 no jeopardy opinion, but address and thus make final conclusions about a different version of the EPA's rule. These earlier opinions therefore were not pre-decisional with respect to the later opinion, which addressed a different proposed rule.

### 4. Other Documents

We disagree with the Services' arguments that the remaining documents, which accompanied the December 2013 draft jeopardy opinions, were pre-decisional because they were either "modified" or excluded from the May 2014 final no jeopardy opinion. These documents—1) a statistical table showing estimated aggregate effects of cooling water intake structures on ESA-protected species (NMFS 61721); 2) several instructional documents for cooling water intake structure operators detailing how to abate the harmful impacts of those structures on specific species (NMFS 5597.1, "Abalone Measures"), (NMFS 7544.2, "Andromous Salmonid Measures"), (NMFS 37695, "Pinniped Measures"), and (NMFS 37667, "Sea Turtle Requirements"); and 3) "Terms and Conditions" that operators of cooling water intake structures must follow in implementing the RPAs (NMFS 14973.1)—were largely instructional, and intended to explain best practices for mitigating the projected, harmful effects of the November 2013 proposed rule. They were not early-stage recommendations for mitigating the impacts of the revised, March 2014 rule, and are thus not pre-decisional as to the May 2014 no jeopardy opinion the Services issued in response to that later rule.

### b.  Deliberative

To shield documents from disclosure under Exemption 5, the Services must not only show that they are pre-decisional, but also that they are deliberative. *Maricopa II*, 108 F. 3d at 1093. Examples of "deliberative" materials include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" or that "inaccurately reflect or prematurely disclose the views of the agency." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118–19 (9th Cir. 1988) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). With three exceptions noted below, the contested documents here are not "deliberative."

The Supreme Court has cautioned against relying on a "wooden" facts-versus-opinions dichotomy for determining whether a document is deliberative. *Assembly of Cal.*, 968 F.2d at 921 (citing *EPA v. Mink*, 410 U.S. 73, 91 (1973)). Accordingly, this circuit applies a "functional approach," which considers whether the contents of the documents "reveal the mental processes of the decision-makers" and would "expose [the Services'] decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine [their] ability to perform [their] functions." *Id.* at 920–21.

After conducting a *de novo* review of the documents, we conclude that only three—the December 2013 RPAs (FWS 279, 308) and April 2014 draft jeopardy opinion (NMFS 5427.1)—could reveal inter- or intra- agency deliberations and are thus exempt from disclosure.

Case 3:15-cv-05872-JCS Document 78 Filed 12/26/18 Page 23 of 37

The Services argue that all the documents at issue are deliberative because they were created as part of a "lengthy and complicated" consultation process between the Services and the EPA about the EPA's water cooling intake structures rule—a process during which many drafts of biological opinions and other documents were circulated intra-agency and inter-agency and "commented upon by others, revised, and recirculated for further discussion." According to the Services, the Sierra Club's request is intended to "uncover any discrepancies between the findings, projection and recommendations" between jeopardy opinions created by "lower-level" Services personnel and the final joint no jeopardy opinion. (quoting *Nat'l Wildlife Fed'n*, 861 F.2d at 1122).

The underlying concern in *National Wildlife Federation* was that releasing "working drafts" and comments on Forest Plans and Environmental Impact Statements (EISs) prepared by "lower-level" Forest Service employees would "reveal the mental processes" that went into choosing and publishing a final Forest Plan and EIS. *Id.* at 1119–22. In other words, a reader with access to both these working drafts and the final plan could "probe the editorial and policy judgment of the decision-makers" who selected and issued the final plan. *Id.*

The draft Forest Plans in *National Wildlife Federation* were a collection of "tentative opinions and recommendations of Forest Service employees"; the draft EISs compared these alternative Forest Plan proposals, thereby revealing the agency's deliberations in choosing a final plan. *Id.* at 1121–22. This understanding of "deliberative"—meaning reflecting the opinions of individuals or groups of employees rather than the position of an entire agency—is shared among the circuits. *See, e.g.,*

*Moye, O'Brien, Hogan & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1279 (11th Cir. 2004) (Amtrak OIG "audit work papers and internal memoranda" that "lower level staff" played a "significant role" in authoring were deliberative); *Grand Cent. Partnership, Inc. v. Cuomo*, 166 F.3d 473, 483 (2d Cir. 1999) (emails between HUD employees that discussed their personal opinions on an investigation into misconduct by a HUD funding recipient were deliberative); *Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 560 (1st Cir. 1992) (Inspector General Reports that were "essential to the consultative process *within* the agency" were deliberative) (emphasis added)).

The dissent makes a similar point about the ongoing nature of the consultative process to argue that documents exchanged between the Services and the EPA during that process are protected inter-agency memoranda. It cites to the ESA Section 7 regulations to point out that the Services "shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives." 50 C.F.R. § 402.14(a). The agency may in turn submit comments to the Service regarding the draft biological opinion within a given window of time, at which point the Service may receive an extension on the time for issuing the opinion. *Id.*

Nothing in the documents at issue here indicates whether the EPA sent these types of comments to the Services, how those comments impacted the Services' jeopardy/no jeopardy conclusion, or anything else about what the substance of those comments might have been. Such documents would likely satisfy the two aforementioned conditions of 1) being an inter-agency memorandum that 2) fell within the ambit of deliberative process.

In the case before the court, we know that the draft opinion was transmitted piecemeal to the EPA, the Services and the EPA agreed to extend the time frame for the consultation, and that "[u]ltimately *based on changes to the regulation*, the Services' final conclusion was that the regulation"—the final version—"was not likely to jeopardize the continued existence of listed species nor likely to destroy or adversely modify critical habitat." (emphasis added). The fact that the decision to revise the rule after the jeopardy finding was the result of additional back-and-forth between the Services and the EPA—deliberative discussions that are not memorialized in the documents before us—does not render the December 2013 opinions or accompanying documents pre-decisional or deliberative as to the Services' opinion about the November 2013 version of the EPA regulation or as to the Services' later conclusion about a different version of the rule.

### 1. 2013 Draft Biological Opinions and Other Documents

After reviewing the documents in this case in camera to make a *de novo* determination, we conclude that neither the December 2013 draft jeopardy opinions (NMFS 44516.1; FWS 252), nor the accompanying statistical and instructional documents (NMFS 5597.1, NMFS 7544.2, NMFS 37695, NMFS 37667, NMFS 14973.1) were prepared by low-level officials, or contain merely tentative findings. These are final products that reflect the agencies' findings on the jeopardy posed by the November 2013 proposed rule, and their recommendations for mitigating the harmful impacts of that rule.

We note that the documents do not contain line edits, marginal comments, or other written material that expose any internal agency discussion about the jeopardy finding.

Nor do these documents contain any insertions or writings reflecting input from lower level employees.[9] The two December 2013 opinions both state they were prepared on behalf of the entire agency and represent that agency's opinion. And the record shows that preparations were being made for the NMFS opinion (NMFS 44516.1), as is, to be publicly "roll[ed] out" and published in the administrative record; the FWS opinion (FWS 252), which includes its agency's seal/header, had received final edits from a senior official and was just awaiting his autopen signature.

The only thing the December 2013 draft jeopardy opinions have in common with the draft Forest Plans and EISs in *National Wildlife Federation* is that they were referred to as "draft" documents. But to treat them similarly would ignore clear substantive distinctions. Unlike the documents in *National Wildlife Federation*, these opinions and accompanying documents represent the final view of the Services on the likely impact of the then-proposed regulation. These final jeopardy opinions from December 2013 pertain to a different rule and are not "earlier draft" versions of the no jeopardy opinion from May 2014; that later opinion addressed a new and different proposed rule.[10]

Moreover, taking seriously our obligation to consider the underlying purpose of the deliberative process privilege, these documents do not reveal more about the internal

---

[9] The NMFS December 2013 jeopardy opinion (NMFS 44516.1) does contain two insertions that could possibly be editorial notes intended to be included in the final report. For that reason, we instruct the district court to redact these lines from that report.

[10] As discussed earlier, the NMFS did prepare a jeopardy opinion concerning the March 2014 rule, which was pre-decisional as to the final no jeopardy joint opinion on that rule.

deliberative process that the Services went through before issuing their joint May 2014 no jeopardy opinion than what the Services themselves have already disclosed during this litigation: that the initial proposed regulation resulted in final drafts of jeopardy opinions in December 2013, that the EPA received portions of those opinions and proposed a revised regulation at some point after that, and that the Services ultimately issued a no jeopardy opinion for that revised, proposed regulation. Nor do the December 2013 jeopardy opinions reveal either the Services' internal deliberative processes that lead to reaching those opinions or the EPA's internal deliberative process that resulted in revising the draft regulation. *Cf. Assembly of Cal. v. U.S. Dep't of Comm.* 968 F.2d 916, 922–23 (9th Cir. 1992) (disclosing final census figures would not reveal the deliberative process in reaching those figures, particularly when the method used to generate the data was already a matter of public record).

Nor would releasing these opinions and accompanying documents allow a reader to reconstruct the "mental processes" that lead to the production of the May 2014 no jeopardy opinion by allowing one to compare an early draft of that opinion to the final opinion. There is no later draft of the Services' opinion regarding the November 2013 version of the rule that a discerning reader could compare to the two December 2013 opinions requested here.

Again, the statistical table (NMFS 61721) and the instructional documents and terms and conditions (NMFS 5597.1, NMFS 7544.2, NMFS 37695, NMFS 37667, NMFS 14973.1) summarize the Services' best practices and recommendations for mitigating environmental harm to certain species, and effectively monitoring the welfare of certain protected species should they appear in the vicinity of a water cooling intake structure. They do not reveal any

28   SIERRA CLUB v. USFWS

internal discussions about how those recommendations were vetted and are thus not deliberative.

## 2. RPAs

Our analysis regarding the December 2013 RPAs (FWS 279, 308) is different from our analysis concerning the December 2013 Draft Biological Opinions and Other Documents because, as discussed above, they *do* appear to be successive drafts of the Services' recommendations for the November 2013 proposed rule. And comparing these drafts would shed light on FWS' internal vetting process. Thus, considering *de novo* whether the Services have carried their burden in showing that these documents are deliberative, we find that they have done so.

By comparison, disclosure of only the March 2014 RPA (FWS 555) will offer no insights into the agency's internal deliberations. It appears to be the final version in a progression of agency recommendations about how to amend the November 2013 proposed rule. The Services have offered no evidence that there were any subsequent versions of this RPA addressing the November 2013 proposed rule. The March 2014 RPA is therefore not deliberative.

## 3. April 2014 NMFS Draft Biological Opinion

Finally, we agree with the Services that the NMFS April 2014 draft jeopardy biological opinion is deliberative. As discussed above, it addresses the revised rule that the EPA proposed in March 2014. A reader could thus conceivably reconstruct some of the deliberations that occurred between the April 2014 and May 2014 opinions by comparing the two. Additionally, the Acting Assistant Administrator for NMFS testified in an affidavit provided to the district court

that this draft of the jeopardy opinion was only circulated internally between one employee and a group of other lower-level employees. The April 2014 draft jeopardy opinion is therefore deliberative and subject to Exemption 5.

## IV.    CONCLUSION

For the foregoing reasons the district court's order to produce the December 2013 draft jeopardy biological opinions (NMFS 44516.1 and FWS 252), the March 2014 RPA (FWS 555), and the remaining statistical and instructional documents (NMFS 5597.1, NMFS 61721, NMFS 7544.2, NMFS 37695, NMFS 37667, NMFS 14973.1) is **AFFIRMED** because the record shows that these materials are not both pre-decisional and deliberative and therefore not exempt under §522(b)(5) of FOIA, Exemption 5.

The district court's order to produce the December 2013 RPAs (FWS 279, 308) and the April 2014 draft jeopardy opinion (NMFS 5427.1) is **REVERSED** because these materials are both pre-decisional and deliberative and thus exempt from disclosure under FOIA Exemption 5. The parties agree that reversal would require the district court to perform a segregability analysis on remand. We instruct the district court to perform that analysis.

The case is **REMANDED** for further proceedings consistent with this opinion.

WALLACE, Circuit Judge, concurring in the result in part and dissenting in part:

I concur in the result reached by the majority as to the April 2014 draft opinion (NMFS 5427.1) and the December 2013 RPAs (FWS 279, 308). I dissent from the result reached by the majority as to the rest of the documents. I respectfully disagree with my colleagues that the deliberative process privilege does not protect the December draft opinions (NMFS 44516.1, FWS 252) and other documents.

The majority overlooks the "context of the administrative process which generated" the December draft opinions. *NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975). They were part of an inter-agency consultation process. 50 C.F.R. § 402.14(a). The regulations governing that process make clear that the purpose of agency review is to allow the Services to consider changes to the draft opinion based on the agency's comments. Specifically, the regulations forbid the Services from issuing the final opinion before the agency has had time to comment on the draft and build in time for the Services to revise a draft opinion to incorporate or respond to any agency comments. *See* 50 C.F.R. § 402.14(g)(5) (Services cannot issue the final opinion "prior to the 45-day or extended deadline while the draft is under [the agency's] review" and if the agency submits comments within 10 days of the final opinion deadline, the Services are entitled to a 10-day deadline extension). The preamble to the regulations explains that the "release of draft opinions to Federal agencies . . . facilitates a more meaningful exchange of information," "may result in the development and submission of additional data, and the preparation of more thorough biological opinions," and "helps ensure the technical accuracy of the opinion."

*Interagency Cooperation—Endangered Species Act of 1973*, 51 Fed. Reg. 19,926, 19,952 (June 3, 1986). Therefore, the regulations governing formal consultations set up a process by which the Services may receive feedback from the agency on draft opinions.

Moreover, a formal consultation may involve not only the Services making a jeopardy decision, but also a decision about what alternative actions are reasonable and prudent, so-called RPAs. The Services and the agency "work[] closely" on the "development of [RPAs]" contained in a jeopardy opinion. *Id.* The "provision to review draft biological opinions" provides the necessary "exchange of information for the development of [RPAs]." *Id.* The Services "will, in most cases, defer to the Federal agency's expertise and judgment" as to whether a draft RPA is feasible, but if the Services disagree, the Services make the ultimate call. *Id.* Thus, even though the Services have discretion as to whether to accept the EPA's comments, the purpose of agency review is to seek the agency's advice on the draft opinion. Seeking comments on a document presupposes the ability to make changes to it, showing it is pre-decisional. It also shows the deliberative nature of the process. Accordingly, the administrative context shows that draft opinions are generally both pre-decisional and deliberative.

A quick look at the record in this case dispels any doubt that the December draft opinions are pre-decisional and deliberative. The FWS draft opinion requests that the EPA "provide any comments" and states that the FWS would need about ten days after receiving comments, assuming they are not substantial, to issue the final opinion. Likewise, the government submitted declarations of two management-level Service employees stating that the drafts were subject

to revision. Gary Frazer, assistant director of the FWS, stated that both draft opinions "were subject to internal review within FWS and the Department of the Interior and consultation with the EPA." Samuel D. Rauch, an administrator at the NMFS, stated that by transmitting a draft opinion to the EPA, the "NMFS is not rendering a final decision" and the document "remains a draft and is subject to change until final signature."

The majority asserts that there is nothing in the record that "indicates whether the EPA sent . . . comments to the Services" on the December draft opinions. Of course, there is not. As the majority observes, the Services "never formally transmitted" the drafts to the EPA. The EPA could not mark up a document it never received. The record, however, is clear that the EPA and the Services engaged in extensive discussions about the draft opinions before and after the December 6 deadline. As the deadline approached, the Services decided based on "internal review and *interagency* review in December" that "additional consultation [with the EPA] was needed to better understand and consider the operation of key elements of EPA's rule." The EPA and the Services "agreed[ ] that more work needed to be done and agreed to extend the time frame for the consultation." That the EPA and the Services jointly concluded the draft opinions needed more work shows their predecisional and deliberative nature: the Services had not made a final decision as of December and the deliberative process was ongoing.

The majority and Sierra Club argue that because the December draft opinions were the Services' "final" word on the November 2013 regulations, the opinions are not pre-decisional. I disagree. The Services' decision would become final only "once the biological opinion is issued." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 940 (9th Cir. 2006); *see also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The majority's observation that the December draft opinions did not contribute to the Services' later decision about the March 2014 regulations is beside the point. The draft opinions are pre-decisional as to the November 2013 regulations, which the EPA changed before finalizing. That the Services never gave their final word as to those regulations does not strip the drafts of their privileged status. A draft that "die[s] on the vine . . . . is still a draft and thus still pre-decisional and deliberative." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014); *see also Sears*, 421 U.S. at 151 n.18 (privilege may apply even if documents "do not ripen into agency decisions").

The majority and Sierra Club contend that the December draft opinions are not deliberative because the Services' management had vetted them and they represented the view of the "entire" Services. But even if true, those facts do not show that the drafts are not deliberative. It is well established that circulation of a draft opinion to *another* agency does not change its privileged status, any more than circulation *within* the agency. The Supreme Court has spoken decisively on this point: "By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency." *Renegotiation Bd. v.*

*Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975). Here, the Services had decisional authority in preparing the opinions, but sought advice from the EPA about the decision. *Grumman Aircraft* teaches that is precisely the type of inter-agency process that Congress designed the privilege to protect.

The majority's decision sets out a categorical rule that the deliberative process privilege protects only documents "reflecting the opinions of individuals or groups of employees rather than the position of an entire agency." This rule contravenes *Grumman Aircraft*, which acknowledged Exemption 5's parity between inter- and intra-agency drafts. 421 U.S. at 188. There the Supreme Court explained, "Exemption 5 does not distinguish between inter-agency and intra-agency memoranda." *Id.* Unsurprisingly, the out-of-circuit cases the majority cites provide no support for its ill-founded rule, much less do they reflect that this view "is shared among the circuits" as the majority claims. In each cited case, the court concluded that the deliberative process privilege protected the documents at issue. *Moye, O'Brien, O'Rourke, Hogan & Pickert v. Nat'l R.R. Passenger Corp.*, 376 F.3d 1270, 1278 (11th Cir. 2004); *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 483 (2d Cir. 1999); *Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 562–63 (1st Cir. 1992). Therefore, even if the majority is right that these cases show that "opinions of individuals or groups of employees" are generally deliberative, they do not support the contrary proposition that "the position of an entire agency" can never be deliberative.

Sierra Club makes much of the fact that "the Services typically include draft biological opinions in their administrative records." Again, even if true, the government's waiver of privilege in some contexts does not waive the privilege here, *see Assembly of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 922 n.5 (9th Cir. 1992), a point that Sierra Club concedes.

Finally, Sierra Club argues that the Services' draft opinions are "significant, legally-mandated drafts, apart from any number of internal or 'working drafts.'" It argues that they are "formal documents reflecting and conveying the Services' conclusions at a prescribed point in the consultation process." This argument reflects a misunderstanding of the governing regulation. It does not require draft opinions shared with the EPA to be "significant" or to constitute a formal statement of the Services' conclusions. The regulation states that the Services must, upon the agency's request, "make available to the Federal agency the draft biological opinion for the purpose of analyzing the [RPAs]." 50 C.F.R. § 402.14(g)(5). The regulation, however, does not provide that a draft opinion shared with an agency be at any particular level of completion or approval. For example, nothing appears to preclude the EPA from requesting to see a draft at the beginning of the process. It also does not require that the Services *ever* provide a draft opinion to the EPA if the EPA does not request it. Given that "Exemption 5 does not distinguish between inter-agency and intra-agency" drafts, *Grumman Aircraft*, 421 U.S. at 188, a draft opinion sent to the EPA is no more disclosable than a draft sent from one working group within the Service to another.

In conclusion, the administrative process that generated the draft opinions shows that they are pre-decisional and deliberative. They are pre-decisional because they do not reflect the Services' final jeopardy and RPA decisions as to the November 2013 regulations. They are deliberative because they are "part of the deliberative process" by which the Services and the EPA consult on those decisions. *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir. 1988). I conclude that the Services may withhold them.

The deliberative process privilege also protects the other documents at issue in this case. Because the NMFS never finalized or adopted the April draft jeopardy opinion (NMFS 5427.1), my analysis above applies to it with equal force. The same is true for the three draft RPAs (FWS 279, FWS 308, FWS 555), which were part of never-finalized jeopardy opinions. In addition, the Services should be able to withhold the four species-specific protective measures (NMFS 5597.1, NMFS 7544.2, NMFS 37695, NMFS 37667), the affected species table (NMFS 61721), and the terms and conditions (NMFS 14973.1). The protective measures are earlier versions of those included in the final opinion. Likewise, NMFS decided not to include the table in the final opinion after deliberations among scientists. Finally, NMFS staff circulated the terms and conditions internally as a possible precedent for a section of the final opinion. In each case, the documents are privileged because disclosure would allow Sierra Club to "probe the editorial and policy judgment of the decisionmakers" by comparing the draft versions to what the Services finally published. *Nat'l Wildlife*, 861 F.2d at 1122.

In conclusion, I would reverse the district court's judgment ordering production of all twelve documents and instruct it to perform a segregability analysis on remand.[1]

---

[1] The Second Circuit recently sustained the Services' assertion of the deliberative process privilege over the critical documents at issue in this case: the three draft biological opinions and the three draft RPAs. *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 65 n.9 (2d Cir. 2018). The court held that the Services' privilege log "adequately describes the nature of the . . . requested documents and their rationale for classifying those documents as deliberative and therefore privileged." *Id.* While we do not have the privilege log's descriptions of the documents, the Second Circuit described them as "draft documents produced by the Services during consultation with the EPA." *Id.* These key facts—that the documents were subject to change and that they reflect a joint deliberative process—are the basis for my dissent.